UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | **Criminal No.:  06-350-01 (CKK)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| | **:** | |
| **FANEL JOSEPH,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

<u>GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE BASED UPON
DEFENDANT'S SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT[1]</u>

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits this motion pursuant to U.S.S.G. § 5K1.1. This provision authorizes the Court, upon motion of the government, to impose a sentence below the sentence otherwise applicable under the United States Sentencing Guidelines (U.S.S.G.). The defendant is subject to a sentencing guidelines range of 292-365 months based on his total offense level of 40, which level includes a three-point reduction for acceptance of responsibility. The United States submits this motion based on the substantial assistance which the defendant has rendered in the investigation and potential prosecution of other persons in the United States and Haiti, therefore entitling him to a downward sentencing departure from his sentencing guidelines range.

**I. Procedural History**

In a related case, on November 16, 2005, the grand jury returned an indictment charging conspirators Jerome Joseph and Widmay Dorvilier with violations of 18 U.S.C. § 1203, Hostage

---

[1] While often motions for downward departure based on substantial assistance are filed under seal, because previous proceedings in this matter have not been sealed the government does not file this motion under seal.

Taking of a United States Citizen, and of 18 U.S.C. § 924(c), Use of a Firearm During a Crime of Violence,  in connection with the abduction at gunpoint and holding for ransom of a five-year old American boy on October 11 and continuing thereafter to October 14, 2005 in the Republic of Haiti, within the extraterritorial jurisdiction of the United States, and, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the District of Columbia.  On March 10, 2006, in case 05-410-02 (CKK), Jerome Joseph pleaded guilty to one count of hostage-taking, in violation of 18 U.S.C. § 1203, with a cooperation provision. On March 22, 2006, in case 05-410-01 (CKK), Widmay Dorvilier pleaded guilty to one count of hostage-taking, in violation of 18 U.S.C. § 1203, and one count of a violation of 18 U.S.C. 924(c), with a cooperation provision.

On December 6, 2006, the grand jury indicted defendant Fanel Joseph for hostage-taking, in this related separate case concerning the same crime, case 06-350-01 (CKK).   On March 9, 2007, Fanel Joseph entered a guilty plea to one count of hostage-taking, with a cooperation provision.

**II.  The Facts**

### A.  Seizing the Child Hostage

Fanel Joseph was one of a group of conspirators who took and held hostage a child, with Fanel Joseph playing a lesser role of holding the child at his house.  In the fall of 2005, M.D. was a five-year-old American boy living with his family in Port au Prince, Haiti.  He was a citizen of the United States, having been born in Jacksonville, Florida in 2000.  On Tuesday, October 11, 2005, at approximately 5 p.m., his calm world was shattered when three hostage-takers, with guns drawn, accosted the five-year old boy and his father in a parking lot as they were about to

leave the school where the father worked in Port au Prince.  One of these men was conspirator

Widmay Dorvilier [*hereinafter* Dorvilier] and another was conspirator Jerome Joseph.  The idea

for the hostage taking had come from some associates of Dorvilier.  Those associates claimed

that the family was wealthy and could pay a large ransom.  To plan the details, Dorvilier held

meetings at his house, attended by Jerome Joseph, defendant Fanel Joseph,[2] a man we shall refer

to as "Conspirator J," and other conspirators.  Dorvilier supplied 9 mm handguns on the day of

the hostage taking.

That afternoon, October 11, 2005, Dorvilier, Jerome Joseph and a third man confronted

M.D. and his father at gunpoint.  The men threw the father into the back seat of the father's car.

They placed little M.D. in the front.  The men climbed into the car, with Dorvilier taking the

wheel.  After driving a short distance, they stopped the car to pick up a fourth conspirator,

"Conspirator J," who got into the car with them.  They drove awhile, then stopped the vehicle

and ejected the father from the car.  Before pushing the father out of the car, they stole from him

some money, his cell phone, and some jewelry.  The hostage-takers instructed the father to

telephone them later at the number of the father's own cell phone, which they had just stolen

from him.

The father made his way back to his place of employment in a state of shock and told

several people what had just happened.  At that time he did not report the kidnaping to the police

for fear that reporting the incident to the police might result in retaliation or harm to his son.  He

also could not bring himself to telephone his wife to tell her what had happened.  She was

---

[2] Jerome Joseph and Fanel Joseph are not related, to the best knowledge of the government.

visiting relatives in the United States and was expecting their second child.  She was having a difficult pregnancy and he was afraid the terrible news would affect her health.

### B.  The Ransom Demands

At about 7 p.m. that night, the father telephoned the hostage takers.  They told him to "relax" and that they would call him back later.  Dorvilier took the lead in the ransom negotiations.  At about 9 p.m., the hostage takers called back.  One of the hostage takers told the father that if he wanted to get his son back, he would have to give them 300,000 "green ones," which the father took to mean United States dollars.  They also said that if the father did not do that, they would bring the disembodied head of the son to the father in the morning.  The father expressed to the hostage takers that he did not have a way to get that amount of money, and certainly not in that time frame.  The hostage takers again stated their demand and hung up the phone.  Some colleagues and friends of the father who knew of the situation notified the police.

The next day, Wednesday, October 12, the day after the kidnaping, at about 6 a.m., the hostage takers again telephoned the father and told him to "go get the money" and then hung up.  At 8 a.m., they telephoned again to ask "what happened to the money."  The father informed them that he could only come up with approximately $1,875 U.S. dollars ("USD").  They instructed him to find more money.  That same day, some friends of the father, knowing that the child was a United States citizen, reported the incident to the United States Embassy in Port au Prince, Haiti, which alerted the Federal Bureau of Investigation [*hereinafter* FBI].

Over the next hours of Wednesday, October 12, the father received more calls demanding ransom from the hostage takers.  They again threatened to kill the boy.  The father tried to persuade them to lower their demands, but they would not budge.  By 8 p.m., the father had

managed to raise more money, approximately $ 2,800 USD.  The hostage takers again threatened

to kill the child if $300,000 USD was not paid.  The threatening calls continued through

Wednesday night and into Thursday, October 13.

On the morning of Thursday, October 13, the hostage takers spoke with the father by

telephone again.  This time they threatened to cut the boy into pieces and return him to the father

in a bag unless the money was paid.  They did not specify exactly when they would do this.  By

this time, the father was terrified.

At about 2 p.m. that same day, Thursday, the hostage takers telephoned the father.  They

informed him that the boy was not doing well, was crying often, and begging for his father.  The

father told them that he could pay approximately $3,750 USD but that he wanted some proof that

his son was still alive before he paid the money.  The hostage takers hung up the phone.  Around

5 p.m., they called back and again asked the father where the money was.  That evening,

Thursday, the father went to a location he had arranged with the hostage takers to pay them the

money he had managed to raise.  The father went to the place and handed over an envelope with

the money to a black male whom he believed was one of the original kidnappers.

The following day, Friday, October 14, the hostage takers again contacted the father

about the payment of the ransom money.  The father told them he had already given them all he

had but that he would call some friends in the United States to see if they would wire him some

money.  The hostage takers asked if the father really believed that he could get money from the

United States.  The father said that he was going to try, but first wanted to talk to his son to make

sure he was still alive.  Little M.D. had been held hostage for more than three days.

Unbeknownst to the father, the hostage takers had taken the boy to the home of defendant

Fanel Joseph, who had agreed to hold the boy there for a cut of the profits. Dorvilier and the other hostage takers agreed to put the boy on the phone in about one hour during the next call, which they did. The father spoke briefly to M.D., who was at Fanel Joseph's house with Dorvilier. Frantically scrambling for funds to save his son's life, the father told the hostage takers to call him back at approximately 2 p.m. that day.

### C. The Rescue of the Child and the Arrests of the Hostage Takers

The same day, Friday, at approximately 1 p.m., the police in Haiti received information from a citizen on where the hostage takers were holding the boy, little M.D. They proceeded to that location and found M.D. With M.D. was Fanel Joseph, who was the only adult at the house. M.D. was playing in the front yard. Fanel Joseph was sitting on the front porch watching him. When the police arrived, Fanel Joseph fled into the house and hid under the bed. Police rescued little M.D. and took Fanel Joseph into custody.

Apparently not yet having learned that the boy had been rescued, the other hostage takers continued their ransom demands of the father for more money. Earlier in the day the father had told them that he would try to raise additional money for ransom from contacts in the United States. Just as the father was driving to the police station to be reunited with his son, he received another demand call from the hostage takers. Police advised the father to tell them that he had the money and that he would meet them to hand it over. The father told the hostage takers that he had $5,000 USD and that he would pay at the same location as the day before.

The father went to the payoff location, where police had set up surveillance. The father was driving a friend's vehicle. Jerome Joseph came up to the father and accepted the envelope he believed contained the ransom money. Dorvilier accompanied Jerome Joseph. Police moved

in and were able to take Jerome Joseph into custody, but Dorvilier fled and eluded police.  Police searched Jerome Joseph upon his arrest and found on him a loaded 9 mm handgun.

After his arrest, the FBI interviewed Jerome Joseph in Haiti on two different dates, October 14, 2005 (the day of his arrest) and November 10, 2005.  At the start of both interviews, the FBI informed Jerome Joseph of his rights in his native language, which he waived both times.  Jerome Joseph identified himself as "James Pierre."  Jerome Joseph gave a statement confessing to his participation in the hostage-taking.  He also implicated his coconspirators, one of whom was in charge of the conspiracy, Widmay Dorvilier, another who was the adult male who was holding the child, defendant Fanel Joseph, and two other conspirators, one of whom had access to inside information about the father's activities, and another who was an active participant in the initial car jacking.  Jerome Joseph stated that the 9 mm handgun he possessed upon his arrest was the same handgun he had used during the car jacking and hostage taking.  While at the police station, Jerome Joseph was in a position to see Fanel Joseph and told the FBI that he was one of the conspirators.

In the November 10 interview, Jerome Joseph admitted that he had given his alias as his name during the October 14 interview.  Jerome Joseph again admitted to his involvement in the kidnaping and supplemented some of his earlier statements.  Jerome Joseph stated he had known Dorvilier for his whole life, that he was a member of Dorvilier's gang, and that he had committed two other kidnapings with Dorvilier's gang.  Jerome Joseph was not shown a photograph of Dorvilier, but told the authorities that he recognized Dorvilier when Dorvilier was brought to the police station.  Dorvilier was arrested several days after Jerome Joseph.

The FBI interviewed Dorvilier on November 9, 2005 at the Haitian court's custodial

facility.  Dorvilier was informed of his rights in his native language, and he waived his rights and

agreed to speak with the FBI.  Dorvilier admitted that he had organized and participated in the

kidnaping of a child with a certain nickname, the very nickname of the five-year-old boy victim,

M.D.  Dorvilier stated that two students from the school approached him with the idea and

claimed that they had an informant in the school.  Dorvilier agreed to orchestrate the kidnaping.

He  recruited Jerome Joseph and several others for the task.  The students drove the three

kidnapers to the school.  Dorvilier then described the kidnaping in a manner generally consistent

with the description provided by the father and Jerome Joseph.   Dorvilier admitted to sending

two individuals to accept the first ransom payment, and then demanding more money from the

father.  He also admitted being present for the second payment, where Jerome Joseph was taken

into custody.  Dorvilier identified Jerome Joseph from a photo array.

        Dorvilier further informed the FBI that he had seen Fanel Joseph in the holding facility

and been housed with him.  While the two were housed together, Fanel Joseph told Dorvilier that

the police had come to his house and rescued the boy.  Dorvilier later stated that Fanel Joseph

had attended a planning meeting at Dorvilier's house.  On November 9, 2005, Dorvilier viewed a

photo array and selected a photo of Fanel Joseph, identifying him as the one who had held the

boy.

        Back on the day of his arrest, October 14, 2005, Fanel Joseph spoke with the FBI.  He

denied that he had knowingly participated in the hostage-taking plot.  His story at that time was

that a friend, "Conspirator J," had asked him if he would watch a child overnight and he agreed.

The next day, he said he was sitting on his porch when the police rushed up to his house.  He

fled inside under the bed and police arrested him.  The FBI interviewed Fanel Joseph again on

November 10, 2005, in jail in Haiti. He again claimed that he did not know that the child had

been kidnaped. He remained in jail while Dorvilier and Jerome Joseph were prosecuted in the

U.S.

On the basis of the identifications, cooperation and guilty pleas by Dorvilier and Jerome

Joseph, the government indicted Fanel Joseph on December 6, 2006. On January 18, 2007,

Fanel Joseph met with the FBI and consented voluntarily to go to the United States to face

prosecution. The FBI interviewed Fanel Joseph on January 29, 2007, as he traveled from Miami

to Washington, D.C. After he was informed of his rights in his native language and waived his

rights, Fanel Joseph gave a truthful version of events. Fanel Joseph had become involved in the

kidnaping through a friend, "Conspirator J," who had brought him to a meeting at Dorvilier's

house in Martissant, Haiti. Conspirator J asked Fanel Joseph if he would agree to hold the boy

at his house in exchange for money. Fanel Joseph agreed and did hold the boy hostage at his

house. Fanel Joseph later pleaded guilty to hostage taking on March 9, 2007.

### III. The Roles of the Conspirators

The government has concluded that the conspirators performed the following roles in the

plot, and notes that Fanel Joseph played a far lesser role than Dorvilier or Jerome Joseph.

Dorvilier was a leader and organizer. The idea for the hostage taking originated with two of

Dorvilier's associates who had an informant that worked at the university where the father

worked. The associates told Dorvilier that the family was rich and could pay a large ransom.

Dorvilier ran planning meetings at his house. He met with the two associates and subsequently

with a larger group of six to seven individuals. Dorvilier was one of the armed hostage-takers

and drove the getaway car as well. Dorvilier supplied at least two guns to the hostage takers.

Dorvilier made ransom demands and threatened to dismember the child if the ransom was not paid.  Dorvilier went to Fanel Joseph's house to put the child on the phone for a proof of life phone call with the father.  Dorvilier was able to keep approximately $500-600 of the first ransom payment, which he quickly spent.  While no prior criminal convictions are known, Dorvilier admitted that he was the leader of a gang that had perpetrated other crimes, including kidnapings, robberies and shootings.

Jerome Joseph was recruited by Dorvilier and attended a planning meeting at Dorvilier's house.  Jerome Joseph was one of the hostage takers.  He was armed with a 9 mm handgun.  Jerome Joseph received a portion of the first ransom payment.  He later went with Dorvilier to pick up the second ransom payment, at which time Jerome Joseph was arrested in possession of a 9 mm handgun.

Fanel Joseph played a small role.  He was recruited by "Conspirator J," who took him to a planning meeting at Dorvilier's house.  At that time, Fanel Joseph agreed to hold the child at his house after the child was taken hostage, which he did.  He received a small amount of money.  The role of the elusive "Conspirator J" was to recruit Fanel Joseph to hold the child, to be the second driver of the getaway car after they kicked the father out, and then to hold the child until they could take the child over to Fanel Joseph's house.  The roles of some of the other conspirators were to provide inside information and to assist Dorvilier in the kidnaping and ransom negotiations.

## IV.  Victim Impact

The child victim, M.D., and his family have suffered serious psychological trauma as a result of this offense.  M.D.'s parents have completed victim impact statements that are attached

hereto as Exhibits A and B.[3]

## V.  The Substantial Assistance of Defendant Fanel Joseph

Once in the United States, Fanel Joseph sought a prompt disposition of the charges against him.  He was eager to cooperate and made every effort to help law enforcement.  Although he had minimized his conduct before, at arrest Fanel Joseph confessed fully to the FBI and named his fellow conspirators.  He provided some nicknames, descriptions and addresses of other conspirators (some of whom were not known previously to law enforcement).  Moreover, Fanel Joseph did not attempt to contest his removal from Haiti.  This decision by Fanel Joseph was of considerable value to the United States, because the extradition process could have consumed much time and many resources.

Upon arrival in the United States, he was assigned defense counsel.  Very shortly after being provided with the facts and evidence, defense counsel indicated that her client was interested in cooperating.  Prior to plea negotiations, Fanel Joseph agreed to four "off-the-record" debriefings, which occurred in February and early March, 2007.  At those meetings, Fanel Joseph provided a complete account of his participation in the crime and provided all the details he could concerning his coconspirators.  Fanel Joseph was frank and forthcoming.  Fanel Joseph's information was somewhat fresher than that of Jerome Joseph or Dorvilier.  Although Fanel Joseph had been in jail during the months he waited in Haiti, he had been in communication with persons who had some helpful information.

On March 9, 2007, Fanel Joseph pleaded guilty to one count of hostage taking, with a cooperation provision.  Fanel Joseph was debriefed again on several occasions after his plea.  He

---

[3] These statements are redacted to protect the identity of the child victim and his family.

identified Conspirator J and another conspirator from photo arrays. Over the next six months, the authorities continued to look for other conspirators, especially Conspirator J (against whom we had the most evidence and for whom Fanel Joseph had provided a correct true name). They made at least three trips to Haiti to follow up on leads. They were able to make some progress in further identifying conspirators described by Fanel Joseph. Despite very diligent efforts by law enforcement, the efforts did not come to fruition in the form of additional arrests.

Because the United States government possesses little evidence against Conspirator J and the others except the uncorroborated statements of Fanel Joseph, Jerome Joseph and Dorvilier, the United States government is unable to prosecute him or the others at this time. Nor is it feasible for the FBI to devote more resources to pursuing more evidence against them in Haiti at this juncture. The United States has given the information collected from Fanel Joseph to the Haitian authorities, who have advised that the evidence may be sufficient under their laws. They are still in the process of considering whether they will prosecute others for this offense, and the outcome will depend on not only the evidence, but also the extent of their resources and other issues.

This was a terrible crime for which the victim and his family continue to suffer psychological pain every day. Fanel Joseph played a small but essential role in this evil scheme. While the gravity of the offense certainly warrants a long sentence, by cooperating Fanel Joseph saved the child and his father the trauma of a trial, and saved the government enormous resources that would have been consumed by a trial of an extraterritorial crime. He provided information sufficient for the Haitians to proceed with other cases, if they so choose. Because of the difficulties of the FBI further pursuing additional evidence in Haiti, we are unable to

12

prosecute any other individuals here in the United States.  Defendant's assistance would have been significant and useful in the prosecution of others, had the United States government possessed other corroborating evidence or witnesses, and will be if the Haitian government chooses to pursue other conspirators for the hostage-taking offense.  Weighing all considerations, the government recommends a substantial departure from the range indicated and recommends that Fanel Joseph's offense level be decreased by four levels to level 36, resulting in a sentence in the range of 188-235 months.  This reduction is significant, causing Fanel Joseph's aggregate exposure to fall from 292-365 months down to 188-235 months.  The government respectfully submits to the Court that the sentence to be imposed  should be in the middle of the new applicable range of 188-235 months, that is a sentence of between 200-223 months.

## VI.  Motion and Recommendation

Based upon these facts and any additional facts presented at the sentencing hearing, pursuant to U.S.S.G. § 5K1.1, the United States hereby moves for a downward sentencing departure of four levels for defendant Fanel Joseph from the applicable sentencing guidelines range at level 40 to the range at level 36 (a range of 188-235 months).   The United States has carefully considered the nature and extent of defendant's assistance and the limitations on it.  The decision to file this motion for departure from the guidelines, represents the assessment by the United States of the overall nature of the assistance which defendant provided to law enforcement, in the United States and in Haiti, in light of the factors listed in § 5K1.1 of the

Sentencing Guidelines.[4] The government respectfully recommends that the defendant receive a sentence in the middle part of that range, that is a sentence of between 200-223 months.

WHEREFORE, the United States respectfully requests that this Court depart downward, as outlined above, based upon the defendant's substantial assistance to the United States.

Respectfully submitted,


JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. BAR NUMBER 498610


_____/s/_____
Jeanne M. Hauch
D.C. Bar Number 426585
National Security Section
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-5776 telephone
(202) 307-6059 facsimile
Jeanne.M.Hauch@usdoj.gov

---

[4] In addition, the Department of Justice gives high priority to creating incentives for targets of criminal investigations to provide information that may help protect United States citizens against acts of violence and terrorism or may relate to foreign intelligence, even if that information does not directly and immediately result in a United States criminal prosecution. See Memorandum from Deputy Attorney General Paul McNulty to All Federal Prosecutors Re: Incentives for Subjects and Targets of Criminal Investigations and Defendants in Criminal Cases to Provide Foreign Intelligence Information, Dated January 10, 2007. Although the assistance provided in this case does not fall squarely within the subject matter of the McNulty memo, the policy described in the memo, coupled with the more traditional benefits derived from defendant's assistance as described here, provides sufficient basis for the filing of this motion.

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that a copy of the foregoing was served by US Mail on counsel for the defendant:

Cynthia Katkish, Esq.
601 Pennsylvania Avenue, NW
Washington, D.C.  20004

on this 11th day of January, 2008.

       _____/s/_____
       JEANNE M. HAUCH
       Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.:  06-350-01 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **FANEL JOSEPH,** | : | |
| | : | |
| **Defendant.** | : | |

<u>ORDER FOR SENTENCING GUIDELINES DEPARTURE PURSUANT TO
GOVERNMENT'S MOTION UNDER U.S.S.G. § 5K1.1</u>

Having reviewed the Government's Motion for Downward Departure Based Upon

Defendant's Substantial Assistance to the Government, any Response thereto, and any such

evidence at any hearing on the motion, the Court hereby rules as follows:

THE COURT HEREBY FINDS that the defendant provided substantial assistance to the

government in the prosecution of other persons, and,

IT IS ORDERED that the Government's Motion be granted and that the sentence

imposed on the defendant will reflect a downward departure from the applicable sentencing

guidelines range.

Date:_____            _____
                                                            UNITED STATES DISTRICT JUDGE

cc:

Jeanne M. Hauch                                   601 Pennsylvania Avenue, NW
Assistant United States Attorney            Washington, D.C.  20004
National Security Section
555 Fourth Street, N.W., 11th Floor
Washington, D.C.  20530


Cynthia Katkish, Esq.

U.S. v. Widmay Dorvilier and Jerome Joseph  05-410 (CKK)
U.S. v. Fanel Joseph  06-350 ( CKK)


ATTACHMENTS

VICTIM IMPACT STATEMENTS **(REDACTED):**

The following initials have been used:

M.D. = Father of child victim
F.M.D. = Mother of child victim
J.D. = Child victim
G.P. = Family friend


A.       STATEMENT OF "M.D." (FATHER OF VICTIM)

B.       STATEMENT OF "F.M.D." (MOTHER OF VICTIM)

ATTACHMENT A
STATEMENT OF "M.D." (FATHER OF VICTIM)

# VICTIM IMPACT STATEMENT:

**Your name:** _  M.D.

**Defendant:** WIDMAY DONVILIER, JERONE JOSEPH, FANEL JOSEPH

**Criminal Case Number:**

**Sentencing date:** 1/30/08 − 1/31/08

**Name of Judge:** _____

**Name of Prosecutor:** JEANNE HAULH

**If anyone assisted you in filling out this form, please list her/his name and affiliation.**

**Name:** _  G.P.

**Affiliation:** Friend & Witness

2

# PHYSICAL IMPACT:

*Please check all physical injuries that resulted directly from the crime.*

____ *Red marks (choking marks)* _____*Concussion*
____ *Scratches, cuts, scrapes, bite marks* _____*Burns*
_____*Welts, knots, lost hair*              _____*Complications with*
_____*Broken blood vessels; bleeding*              *Pregnancy*
_____*Stitches and staples*              ___*Sprains, broken bones*
_____*Unconscious*              ____*Internal injuries*
_____*lacerations and stab wounds*    __    *bruises and swelling* __*Busted lip*

*Describe the injuries as well as any long-term health problems, hospitalizations, and the impact that your*
*health problems have had on your daily functioning.*

No Physical injuries occurred.

# EMOTIONAL IMPACT

*Please describe your reactions during and immediately following the incident. The following checklist can be used as a guideline if you think it is helpful.*

X shock                          ___helplessness
X sadness                       ___numbness
X confusion                    X fear of being mutilated
___feeling betrayed          X fear
X thoughts about dying      X wishing you were dead
                                      X anger                          X depressed
    X felt terrorized

I felt terrorised because my son were in a place
where I don't know and I couldn't handdle the
pressure they were giving me and I didn't
want there to kill my boy.

*What were your reactions following the crime, when your feelings and responses may have been the most intense? The following checklist can be used as a guideline if you think it is helpful.*

X afraid of everything/terrified   X panic/phobic reactions
X fear of being re-victimized      ___ fear of law enforcement
X embarrassment or shame        ___blaming self for what happened
___physical ailments               ___ thoughts of suicide
X uncontrollable crying             X anger
X unable to concentrate            X desire to be alone; withdrawing
___ fear of him killing me

*Please describe any of the items you checked.*

Until today, we have the fear of being re-victi-
mized and we are afraid of everybody. As a
Result the division of my family my wife and
children in the States and myself in Haiti.

*How has this crime effected your ability to perform your work, make a living, run a household, or enjoy any other activities previously performed or enjoyed?*

My home is divided. My wife as a staff member in
my business can't work anymore. I can't have a
direct influence on the education of my kids. And I can't
take time to supervise my work due to fear.

*Since you were assaulted, how have you felt about the violence you endured? The following checklist is to*

*help you to remember the impact. Please describe in your own words how the crime has changed your life.*

- ☒ *don't trust people*
- ☒ *sleep problems*
- ☒ *"flashbacks" or nightmares about the crime*
- ☒ *anxiety, shaking, feeling panicky or jumpy*
- ☒ *trouble concentrating*
- ☒ *avoiding places/people that remind you of incident\**
- ☒ *changed feelings of personal safety or well-being*
- ☒ *more withdrawn and isolated*
- ☒ *irritability*
- ☒ *crying or feeling depressed*
- ____ *suicidal thoughts more of the time*
- ☒ *trouble getting along with friends/family*
- ____ *if you are religious - less faith in God*
- ☒ *less confidence in abilities and judgement*

*Please describe any of the items you checked.*

It's like a nightmare that I live everyday and every night and it takes me a lot of time to take those ideas away, so trouble concentrating.
Sometimes I feel that I'm weak in life and I'm wandering why do I need to work.
Sometimes, it's painful to realize that I can't get along with my friends, my relatives and my love ones.

# FINANCIAL IMPACT

| Type of Cost | Cost | Reimbursement to date |
|---|---|---|
| Hospital Emergency | | |
| Other medical | Psychiatric $3.000 us | |
| Mental Health | | |
| Destroyed Property | | |
| Lost wages from rehabilitation | | |
| Lost wages from court attendance | | |
| Lost wages resulting from job loss | My wife lost her Job. $30.000 us a year | |
| Installed new locks | | |
| Moving expenses | it costs me $2,500 us monthly to take care of them | |
| Other | I gave $30.000 ht to the Kidnappers | |

*Please describe any financial loss including the total amount of loss to you (total cost less*

*any reimbursement)*

I had to see doctors, I spent $3.000 us all together; my wife lost her Job which is evaluated to $30.000 us. Due to that situation, my family lives now in Miami and it costs me $2,500 us a month to take care of them which is $30.000 us a year, plus $30.000 haitian money that I gave to the Kidnappers which is about $4.000 us. All together, I spent $70.000 us

6

## CONCLUSION

*What would you like to see happen to the defendant in terms of the following:*

**1)** **jail term - Please say what you think is fair and why.**

I wish that they get exactly what is necessary in this case.

**2)** **If applicable, do you want the defendant to give you back any of the money that you lost as a result of the offense? If not, why not.**

I would greatly appreciate to recieve my money back

**3)** **Do you want the defendant to be required to get treatment while either incarcerated or on probation? If you knew the defendant, would you recommend any particular type of treatment?**

_ alcohol abuse          _drug treatment (drug of choice is crack)

___ batterer treatment          _psychiatric treatment

I don't think they were under the influence of any drugs. I don't think they need that.

**4)** **Do you have fears about the defendant contacting you in the future? Would you like the defendant to be ordered to stay away from you as a condition of probation/parole?**

Of course, I do have fears for my family and myself in the future. I'd like them to stay away of my home and my business.

**5)** **Would you like to attend a parole hearing if/when the defendant is being considered for parole?**

Yes, I would like to.

_November 08, 2007_
**Date**

M.D.

Signature

7

ATTACHMENT B
STATEMENT OF "F.M.D." (MOTHER OF VICTIM)

# VICTIM IMPACT STATEMENT:

**Your name:**    F.M.D.

**Defendant:** WIDMAY DONVILIER, JERONE JOSEPH, FANOL JOSEPH

**Criminal Case Number:**

**Sentencing date:** Jan 30-31, 2008

**Name of Judge:** _____

**Name of Prosecutor** AUSA JEANNE HAWEH

If anyone assisted you in filling out this form, please list her/his name and affiliation.

    **Name:** _____

    **Affiliation:** _____

2

# PHYSICAL IMPACT:

*Please check all physical injuries that resulted directly from the crime.*

_X_ *Red marks (choking marks)* _____ *Concussion*
_x_ *Scratches, cuts, scrapes, bite marks* _____ *Burns*
_____ *Welts, knots, lost hair*                    _____ *Complications with*
_____ *Broken blood vessels; bleeding*                    *Pregnancy*
_____ *Stitches and staples*                    _____ *Sprains, broken bones*
_____ *Unconscious*                    _____ *Internal injuries*
_____ *lacerations and stab wounds*        __    *bruises and swelling* __*Busted lip*

*Describe the injuries as well as any long-term health problems, hospitalizations, and the impact that your health problems have had on your daily functioning.*

After the injuries,    J.D.   had a hard time
to feel good about his health. He got fever
red marks and lost weight for the
next three months following the injuries.
Until now he never got the weight he
lost. His dad was affected because the
slap him with a gum the day or the
injuries. we do not know if    J.D.
had other physical injuries during the
four days he spent in the place he were
at this time.

3

# EMOTIONAL IMPACT

*Please describe your reactions during and immediately following the incident. The following checklist can be used as a guideline if you think it is helpful.*

x shock                  ___ helplessness
x sadness                ___ numbness
x confusion            ___ fear of being mutilated
__ feeling betrayed        __ fear
__ thoughts about dying     __ wishing you were dead
                           __ anger                       x depressed

__ felt terrorized

*What were your reactions following the crime, when your feelings and responses may have been the most intense? The following checklist can be used as a guideline if you think it is helpful.*

x afraid of everything/terrified    __ panic/phobic reactions
x fear of being re-victimized         __ fear of law enforcement
__ embarrassment or *shame*         ___ blaming self for what happened
__ physical ailments                __ thoughts of suicide
x uncontrollable crying
__ unable to concentrate        __ anger
___ fear of him killing me          __ desire to be alone; withdrawing

*Please describe any of the items you checked.*



Following the crime J.D. was afraid of every thing. He felt like running when he saw some one near him and Dad's car and when he saw a police officer. Since all the family can not control crying every time they remember about the situatia

*How has this crime effected your ability to perform your work, make a living, run a household, or enjoy any other activities previously performed or enjoyed?*

We take the first year and half for a re. adaptation. J.D. still can not handle the crime.

*Since you were assaulted, how have you felt about the violence you endured? The following checklist is to*

*help you to remember the impact. Please describe in your own words how the crime has changed your life.*

✓ *don't trust people*
✓ *sleep problems*
✓ *"flashbacks" or nightmares about the crime*
✓ *anxiety, shaking, feeling panicky or jumpy*
___ *trouble concentrating*
___ *avoiding places/people that remind you of incident\**
_ *changed feelings of personal safety or well-being*
__*more withdrawn and isolated*
___ *irritability*
___ *crying or feeling depressed*
___*suicidal thoughts more of the time*
__ *trouble getting along with friends/family*
___ *if you are religious - less faith in God*
_ *less confidence in abilities and judgement*

**Please describe any of the items you checked.**

We feel cannot trust people since he was ques
tion that family friends were implicated in
the crime. Personally ~~me he~~ I have sleeps problems
every time    J.D.    feels sad or anxious ~~about~~
~~what to the inci~~ because of the incidence.
we still do not have problems to go back to Haiti
because all other members of the family are
there. But from ~~here~~ here we are afraid about
every thing.

# FINANCIAL IMPACT

| Type of Cost | Cost | Reimbursement to date |
|---|---|---|
| Hospital Emergency | | |
| Other medical | | |
| Mental Health | | |
| Destroyed Property | | |
| Lost wages from rehabilitation | | |
| Lost wages from court attendance | | |
| Lost wages resulting from job loss | | |
| Installed new locks | | |
| Moving expenses | | |
| Other | | |

*Please describe any financial loss including the total amount of loss to you (total cost less*

*any reimbursement)*

6

## CONCLUSION

*What would you like to see happen to the defendant in terms of the following:*

1)     *jail term - Please say what you think is fair and why.*

Yes. Its fair to see people who hurt yourself
and your family in jail term. All humans
are striving for justice and equity. This con
reassore the family.

2)     *If applicable, do you want the defendant to give you back any of the money that you lost as a result of the offense? If not, why not.*

no, because money can not heal and
help them us. to minimize all the negative
impact.

3)     *Do you want the defendant to be required to get treatment while either incarcerated or on probation? If you knew the defendant, would you recommend any particular type of treatment?*

_ alcohol abuse          __drug treatment (drug of choice is crack)

___ batterer treatment      __psychiatric treatment

4)     *Do you have fears about the defendant contacting you in the future? Would you like the defendant to be ordered to stay away from you as a condition of probation/parole?*

Yes I have fears. I am wondering if one
day after their jail term, they meet a member
of my family what they will be their reactions

5)     *Would you like to attend a parole hearing if/when the defendant is being considered for parole?*

Yes.

11/16/2007
_____
Date

F.M.D.

**Signature**

7